# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 11, 2014        Decided July 11, 2014

No. 13-1231

SPECTRUM FIVE LLC,
APPELLANT

v.

FEDERAL COMMUNICATIONS COMMISSION,
RESPONDENT

ECHOSTAR SATELLITE OPERATING CORPORATION,
INTERVENOR

———

Consolidated with 13-1232

———

On Appeal From and Petition For Review of an
Order of the Federal Communications Commission

———

*Scott H. Angstreich* argued the cause for appellant. With him on briefs were *John Thorne* and *Aaron M. Panner*.

*Matthew J. Dunne*, Counsel, Federal Communications Commission, argued the cause for appellee. With him on the brief were *William J. Baer*, Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson* and *Robert J. Wiggers*, Attorneys, *Jonathan B. Sallet*, Acting General Counsel, Federal Communications Commission, and *Jacob*

*M. Lewis*, Associate General Counsel. *Richard K. Welch*, Deputy Associate General Counsel, Federal Communications Commission, and *James M. Carr*, Counsel, entered appearances.

*David H. Solomon*, *Bryan N. Tramont*, *Craig E. Gilmore*, and *Phuong N. Pham* were on the brief for intervenor EchoStar Satellite Operating Corporation in support of appellee.

*Christopher J. Wright* was on the brief for *amicus curiae* DIRECTV, LLC in support of appellee.

Before: TATEL, SRINIVASAN and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* Wilkins.

WILKINS, *Circuit Judge*: Cable television has for many years been the primary way consumers receive video programming. A growing competitor of cable television is satellite service. *See Comcast Corp. v. FCC*, 579 F.3d 1, 3, 8 (D.C. Cir. 2009). The demand for orbital space and radio spectrum is great in the increasingly competitive satellite service industry. Securing rights to operate a satellite at an orbital location is, therefore, extremely valuable. And even more valuable is the right to operate a satellite while requiring that other satellite operators at nearby orbital locations not interfere with your operations. The coordination of these rights and the allocation of radio spectrum amongst many nations are handled primarily by the International Telecommunication Union ("ITU").

This petition involves Bermuda's efforts to secure rights from the ITU to operate a satellite at the 96.2° W.L. orbital

location.[1]  As required by the ITU's regulations, to obtain such rights Bermuda needed to deploy and maintain a satellite at this orbital location.  Bermuda did so by partnering with Intervenor EchoStar Satellite Operating Corporation ("EchoStar"), and EchoStar then requested special temporary authority from the Federal Communications Commission (FCC or Commission) to move a satellite from its then-current location at 76.8° W.L. to the desired 96.2° W.L. orbital location.

The Netherlands, meanwhile, also sought rights from the ITU to operate a satellite at the nearby 95.15° W.L. orbital location.  But if Bermuda secured its rights before the Netherlands, then Bermuda—through the ITU—could require that the Netherlands (and any other country with subordinate rights) not interfere with any of its satellite operations.  Thus, petitioner Spectrum Five LLC ("Spectrum Five")—a developer and operator of satellites working in partnership with the Netherlands—filed an objection with the FCC to

---

[1] "[S]atellites of the sort at issue in this case are geostationary—meaning that they are effectively located at a fixed point in space, directly above the equator at a particular longitudinal 'orbital location' denoted in degrees of longitude."  DIRECTV Amicus Curiae Br. at 2.  However, "[a] satellite in the geostationary orbit cannot be thought of as 'fixed in space.' On the contrary, it is in permanent motion caused by both natural forces and occasional corrective impulses exerted by the satellites [sic] propulsion system.  The satellite moves like a ball maintained in the air by skillful kicks of a football player's foot . . . ."  United Nations Committee on the Peaceful Uses of Outer Space, *Physical Nature and Technical Attributes of the Geostationary Orbit: Study Prepared by the Secretariat*, ¶ 18, U.N. Doc. A/AC.105/404 (January 13, 1988) (cited in Resp. Addendum at p.7).  In our case, the satellite's propulsion system was used to reposition it from one orbital location to another.

EchoStar's request to move its satellite from 76.8° W.L. to 96.2° W.L. However, the Commission granted EchoStar's request, and thereafter the ITU determined that Bermuda secured rights to the 96.2° W.L. orbital location.

Spectrum Five petitions for review of the Commission's order, arguing principally that the Commission acted arbitrarily and capriciously because it incorrectly concluded, in Spectrum Five's view, that there were extraordinary circumstances justifying the Commission's decision to grant EchoStar's request. Because Spectrum Five has failed to demonstrate a significant likelihood that a decision of this Court would redress its alleged injury, we dismiss its petition for lack of Article III standing.

I.

A.

To provide context for Spectrum Five's petition, we begin with an overview of broadcast satellites, which are regulated both domestically and internationally. The FCC regulates satellite service for signals transmitted or received within the United States. One of these services is direct broadcast satellite ("DBS"). Although DBS is a term used informally to refer to satellite television broadcasts intended for home reception,[2] under FCC regulations DBS specifically refers to a "radiocommunication service in which signals transmitted or retransmitted by . . . space stations in the 12.2–12.7 GHz frequency band are intended for direct reception by subscribers or the general public." *See* 47 C.F.R. §§ 2.1,

---

[2] *See Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 700 (D.C. Cir. 2011) ("[D]irect broadcast satellite (DBS) companies . . . transmit programming via direct-to-home satellites.").

25.201. DBS providers include companies such as Dish Network and DIRECTV, LLC ("DIRECTV"). New entry of additional DBS providers is precluded by a freeze on DBS applications that the FCC instituted in 2005, following our prior invalidation of the FCC's DBS license auction procedures. *See Northpoint Technology, Ltd. v. FCC*, 412 F.3d 145 (D.C. Cir. 2005).

In addition to domestic regulation by the FCC, the use of DBS satellites is subject to an international, treaty-based regulatory framework administered by the ITU, a specialized agency of the United Nations. This treaty sets forth regional plans that apportion the United States and other ITU member nations (referred to as "administrations") spectrum and orbital locations for DBS service.[3] The United States falls within the ITU's Region 2 "Broadcasting-satellite service (BSS)"[4] Plan (or "the Plan"), *Northpoint*, 412 F.3d at 148, and has been assigned DBS frequencies at eight orbital locations,[5] *see DIRECTV, Inc. v. FCC*, 110 F.3d 816, 821 (D.C. Cir. 1997).

Assignments under the Plan are not set in stone, however; administrations may modify the Plan by filing a request with the ITU. ITU Radio Regs. App. 30, Art. 4.2 (2012). An administration must satisfy two conditions to modify the Plan. First, the filing administration has eight years to "br[ing] into use" the requested assignment. *Id.* App. 30, Art. 4.2.6. This requires, among other things, deploying and maintaining at

---

[3] *See Amendment of the Commission's Policies and Rules for Processing Applications in the Direct Broadcast Satellite Service*, 21 FCC Rcd 9443 ¶ 3 (2006) ("*DBS Applications NPRM*").

[4] Direct broadcast satellite service (DBS) is referred to internationally as broadcasting satellite service (BSS).

[5] The orbital locations are: 61.5° W.L., 101° W.L., 110° W.L., and 119° W.L., 148° W.L., 157° W.L., 166° W.L., and 175° W.L.

the requested orbital location a satellite capable of providing service in the relevant frequencies for at least ninety consecutive days. *Id.*, Art. 11.44B. Second, the filing administration must also reach agreement with "affected administrations." *Id.* App. 30, Art. 4.2.3. Affected administrations are nations that have already received assignments from the ITU to operate in the same radiofrequency bands at nearby orbital locations, or that have pending modification requests to operate in the same radiofrequency bands at nearby locations.

If the filing administration satisfies both conditions—and thus perfects its filing—then the ITU will enter the orbital slot assignment in the ITU Master International Frequency Register. *Id.* App. 30, Art. 4.2.19. Perfecting a filing is significant because satellites operating pursuant to that filing have priority over subsequent filings, thus entitling the satellite operation to "interference protection" from satellites operating pursuant to subordinate filings. If the filing is not brought into use in eight years, however, then it lapses, meaning the ITU will suppress the filing and remove the frequency assignments from its databases. *Id.* App. 30, Art. 4.1.3.

This dual regulatory scheme often requires parties to comply both with ITU regulations and the relevant domestic laws. For example, say a party sought to deploy a satellite to the 101° W.L. orbital location. Pursuant to ITU regulations, that party must, among other requirements, obtain authorization from the administration with rights to the 101° W.L. orbital location, *see id.*, Art. 18.1, which is the United States. In addition, if the party wanted to provide DBS service to the United States, it must obtain a license from the FCC. *See* 47 C.F.R. § 25.102(a).

B.

Under the Plan, Bermuda has been assigned provisional rights to operate 16 of the 32 BSS channels at the 96.2 W.L.° orbital location. ITU Radio Regs., App. 30, Art. 10; Joint Appendix (J.A.) 10. Through a filing with the ITU known as BERMUDASAT-1, the United Kingdom (U.K.) on behalf of Bermuda sought to modify the Plan to secure rights to operate all 32 BSS channels at this orbital location. *Id.* Because the U.K. made the filing on April 15, 2005, it had until April 14, 2013 to bring its requested assignment into use before it lapsed. *See EchoStar Satellite Operating Company Application for Special Temporary Authority Related to Moving the EchoStar 6 Satellite from the 77° W.L. Orbital Location to the 96.2° W.L. Orbital Location, and to Operate at the 96.2° W.L. Orbital Location*, 28 FCC Rcd 4229, 4231 ¶ 8 (Int'l Bur. 2013) (*Bureau Order*). To deploy a satellite at 96.2° W.L., Bermuda entered into an agreement with SES, a global satellite services provider. SES Satellite Leasing Limited (an SES affiliate company)[6] and its development partner, EchoStar, decided to use a satellite known as EchoStar 6 to bring into use the BERMUDASAT-1 filing. *Id.* at 4229 ¶ 2. EchoStar 6, which was launched in July 2000 pursuant to an FCC license, had been located at 76.8° W.L. *Id.* at 4229–30 ¶ 3. Therefore, EchoStar needed the FCC's permission to move the satellite to 96.2° W.L. Under FCC regulations, applications to modify a satellite license are subject to a 30-day public notice and comment. *See* 47 U.S.C. § 309(b); 47 C.F.R. §§ 25.117; 25.151(d). As of early February 2013, however, EchoStar had not initiated the notice and comment process. Given the ITU's April 14, 2013

---

[6] We will use SES to refer to SES and all of its affiliate and subsidiary companies.

deadline for bringing into use the BERMUDASAT-1 filing, modifying EchoStar's FCC license to allow EchoStar 6 to move to 96.2° W.L. was not a viable option. *Bureau Order*, 28 FCC Rcd at 4231 ¶ 8 n.17.

Instead, scrambling to meet this deadline, on February 20, 2013, EchoStar filed an application with the FCC's International Bureau ("Bureau") for special temporary authority ("STA") to move EchoStar 6. J.A. 10. Under FCC regulations, the Commission may grant a request for STA "only upon a finding that there are extraordinary circumstances requiring temporary operations in the public interest and that delay in the institution of these temporary operations would seriously prejudice the public interest." 47 C.F.R. § 25.120(b)(1). In its request for STA, EchoStar stated that it was "making this request to accommodate the needs of its customer and development partner, SES Satellites (Bermuda) Ltd. . . . which has been authorized to operate a BSS satellite at 96.2° W.L. pursuant to the BERMUDASAT-1 filing." J.A. 11. EchoStar also stated that "SES intends to use EchoStar 6 at 96.2° W.L. to evaluate and develop commercial service opportunities in the Caribbean, Latin American, and North Atlantic markets outside of the United States." *Id.* EchoStar asked the Commission to act on its request "by March 12, 2013 so that commercial development may begin at the earliest possible date." *Id.*

Both Spectrum Five and DIRECTV filed objections with the FCC to EchoStar's STA application. Spectrum Five objected because it, too (in partnership with Netherlands), sought to secure international rights for what was essentially the same orbital location. Pet'r's Br. at 11. Specifically, in 2011 the Netherlands made on behalf of Spectrum Five a filing with the ITU known as BSSNET3-95W, to operate a satellite at the 95.15° W.L. orbital location. *Id.* at 11, 29.

However, because the U.K. made its filing first, if the U.K. brought into use its filing, its satellite operations would be entitled to interference protection from the Netherlands' satellite operations. Given the close proximity between the requested assignments in the BERMUDASAT-1 and BSSNET3-95W filings, Spectrum Five asserted to the Commission that the satellites could not "operate concurrently because of interference considerations." *Id.* at 11 n.9.

As for DIRECTV, prior to the BERMUDASAT-1 filing it had sought a modification of the Plan to operate multiple DBS satellites—DIRECTV 4S, DIRECTV 8, and DIRECTV 9S—at the nearby 101° W.L. orbital location. DIRECTV Amicus Curiae Br. at 8–9. The modification process for DIRECTV 4S and 8 had begun (and was perfected under ITU regulations) prior to the U.K.'s BERMUDASAT-1 filing, and thus these satellite operations were entitled to interference protection from satellites operating pursuant to the U.K. filing. *Id.* at 8–9. The modification for DIRECTV 9S, however, was filed on May 9, 2005, several weeks after the BERMUDASAT-1 filing. *Id.* The later-filed U.S. modification for DIRECTV 9S would therefore "affect" Bermuda's operations, thus entitling Bermuda's operations to interference protection from DIRECTV 9S—and all future (subordinate) modifications at the 101° W.L. orbital location.

DIRECTV subsequently withdrew its objection to EchoStar's STA request, however, after it entered into a "coordination agreement" with SES. *Bureau Order*, 28 FCC Rcd at 4230 ¶ 5. In a March 2013 letter, SES explained to the FCC that "it had concluded an operator-to-operator coordination arrangement with the U.S. DBS operator at 101° W.L. that fully resolves any concern about the impact of Bermuda DBS operations at 96.2° W.L. on existing and future U.S. DBS services at the nominal 101° W.L. orbital location."

J.A. 109. "As a result," SES commented, it "looked forward to a prompt grant of EchoStar's request for [STA] to move the EchoStar 6 satellite to 96.2° W.L." *Id.* Because the U.S. was the "responsible administration" for EchoStar 6 under ITU regulations, as part of the coordination agreement the FCC agreed not to raise any objections with the ITU to the U.K. bringing into use the BERMUDASAT-1 filing. *Bureau Order*, 28 FCC Rcd at 4234 ¶ 15.

The Bureau subsequently granted EchoStar's STA request. *Bureau Order*, 28 FCC Rcd at 4229 ¶ 1. It found that there were "extraordinary circumstances," primarily due to the benefits derived from the coordination agreement between EchoStar and DIRECTV. *Id.* at 4232 ¶¶ 9–10. The Bureau found that "the proposed EchoStar 6 operations will have no foreseeable adverse impact on U.S.-licensed operations or related U.S. ITU filings," and further found that "no operating satellite will experience harmful interference from EchoStar 6's proposed operations as a result of this STA grant." *Id.* at 4232 ¶ 10. Notably, in response to Spectrum Five's and the Netherlands' argument "that there are 'material' differences in technical parameters between the operations proposed in the EchoStar STA and the BERMUDASAT-1 filings," the Bureau stated their "concerns . . . are ones that, in our view, can only be resolved by the U.K. and Netherlands Administrations, with the assistance of the ITU if necessary[.]" *Id.* at 4232 ¶ 15. Continuing its discussion of the FCC's limited role, the Bureau stated:

> We therefore express no view and will take no position regarding the validity or priority of the ITU filings of either Administration, or the conformity with the ITU Radio Regulations and associated rules of procedure of any notification by the U.K. Administration to the ITU concerning such filings,

except to the extent of assuming the validity of those filings in connection with the operator-to-operator arrangement reached by DIRECTV and SES Bermuda.

*Id.*

Spectrum Five sought review by the Commission, which upheld the Bureau's decision. *EchoStar Satellite Operating Company Application for Special Temporary Authority Related to Moving the EchoStar 6 Satellite from the 77° W.L. Orbital Location to the 96.2° W.L. Orbital Location, and to Operate at the 96.2° W.L. Orbital Location*, 28 FCC Rcd 10412, 10412 ¶ 1 (2013) (*STA Order*). In its order, the Commission also stated that the Bureau properly declined to take any position regarding the implications of granting EchoStar's STA request on the BERMUDASAT-1 filing with the ITU, explaining that "such [a] determination[] [is] for the ITU." *STA Order*, 28 FCC Rcd at 10417 ¶ 12. On September 3, 2013, a few months after the Commission issued its *STA Order*, the ITU recorded the BERMUDASAT-1 filing in the ITU Master International Frequency Register. Pet'r's Addendum at 38–42.

Spectrum Five petitioned this Court for review of the Commission's order, asserting that we have jurisdiction pursuant to 47 U.S.C. § 402(a).[7]

---

[7] Spectrum Five filed both a petition for review under § 402(a) and a notice of appeal under section § 402(b)(6) of the Communications Act. Recognizing that these provisions are "mutually exclusive," *NextWave Personal Commc'ns, Inc. v. FCC*, 254 F.3d 130, 140 (D.C. Cir. 2001), Spectrum Five asks us to dismiss the filing that relies on the incorrect jurisdictional provision. Pet'r's Br. 1 & n.1. Because EchoStar did not seek to "modify" its license, 47 C.F.R. § 25.117, but instead sought and was granted "special temporary

## II.

Spectrum Five contends that the Commission's granting of EchoStar's STA request was arbitrary and capricious, and requests that we vacate the Commission's order. Pet'r's Br. at 13–17. According to Spectrum Five, if we vacate the *STA Order*, EchoStar 6 would never have had lawful authority to operate at 96.2° W.L, and, consequently, the U.K. did not successfully bring into use the BERMUDASAT-1 filing. *Id.* at 24. In addition to vacatur, Spectrum Five asks us to order the FCC to take four additional steps:

> (1) notify[] the ITU that EchoStar 6 did not have lawful authority to operate at 96.2° W.L., (2) notify[] the ITU that, as a result, the United States does not consent to the U.K.'s use of EchoStar 6 to bring the BERMUDASAT-1 filing into use, (3) revok[e] its ratification of the coordination agreement privately negotiated among EchoStar, DIRECTV, and SES Bermuda, which was a prerequisite for the U.K.'s claim to have brought into use the BERMUDASAT-1 filing, and (4) inform[] the ITU that the BERMUDASAT-1 filing expired because EchoStar 6 was not successfully maintained at 96.2° W.L. by the April 14 deadline.

*Id.* at 35–36.

---

authority," 47 C.F.R. § 25.120, Spectrum Five has not "appealed" a Commission order granting, renewing, or modifying a license. *See* 47 U.S.C. § 402(b)(6); *Freeman Eng'g Assocs., Inc. v. F.C.C.*, 103 F.3d 169, 177 (D.C. Cir. 1997). Jurisdiction therefore lies, if at all, under § 402(a), because Spectrum Five asks this Court to vacate the *STA Order*. We therefore dismiss Spectrum Five's appeal under § 402(b)(6).

We need not reach the merits of Spectrum Five's petition, however, because we conclude that it has failed to satisfy the redressability requirement of Article III standing.[8] Specifically, Spectrum Five has not satisfied its burden of showing that, if this Court were to vacate the *STA Order*, there is a significant increase in the likelihood that the ITU—a third party not before this court and not subject to our authority—would reverse course and conclude that the U.K. did not bring into use the BERMUDASAT-1 filing. Also, without deciding whether we have authority to take all of the additional steps requested by Spectrum Five, we conclude that, in any event, Spectrum Five still falls short of satisfying its burden even if we take the additional steps it requests.

A.

"To establish the 'irreducible constitutional minimum' for Article III standing, a party must show that it has suffered an injury in fact, that there exists a causal link between that injury and the conduct complained of, and that a favorable decision on the merits will likely redress the injury." *US Ecology*, 231 F.3d at 24 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992)). To satisfy the redressability requirement, the petitioner must demonstrate "that it is likely as opposed to merely speculative that the injury will be redressed by a favorable decision of the court." *Klamath Water Users Ass'n v. FERC*, 534 F.3d 735, 738 (D.C. Cir. 2008).

---

[8] This conclusion makes it unnecessary to determine whether Spectrum Five has satisfied the other requirements of Article III standing. *See US Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000).

Further, "[w]hen redress depends on the cooperation of a third party, 'it becomes the burden of the [party asserting standing] to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.'" *US Ecology,* 231 F.3d at 24-25 (quoting *Lujan,* 504 U.S. at 562); *see also Klamath Water*, 534 F.3d at 739 ("In a case like this, in which relief for the petitioner depends on actions by a third party not before the court, the petitioner must demonstrate that a favorable decision would create 'a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.'" (quoting *Utah v. Evans*, 536 U.S. 452, 464 (2002))).  It is " 'substantially more difficult' " for a petitioner to establish redressability where the alleged injury arises from the government's regulation of a third party not before the court.  *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 933 (D.C. Cir. 2004) (quoting *Lujan*, 504 U.S. at 562); *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1273 (D.C. Cir. 2007) (same).  Here, the asserted injury is even one step further removed from the typical case in which redress depends on the independent action of a third party not before the court, because the ITU is an international organization that is not regulated by our government and therefore not bound by this Court or the FCC.

Spectrum Five contends that "vacatur would remove both the United States' consent to the U.K.'s use of EchoStar 6 to bring into use the BERMUDASAT-1 filing and the domestic authority for EchoStar 6 to operate at 96.2° W.L."  Pet'r's Br. at 34.  Spectrum Five asserts that this "will significantly increase the likelihood that the ITU denies the U.K.'s claim that it bought into use the BERMUDASAT-1 filing."  *Id.*  We disagree.

In support of its contention, Spectrum Five relies on Article 11.44B of the ITU Radio Regulations. This article states in relevant part:

> A frequency assignment to a space station in the geostationary-satellite orbit shall be considered as having been brought into use when a space station in the geostationary satellite orbit with the capability of transmitting or receiving that frequency assignment has been deployed and maintained at the notified orbital position for a continuous period of ninety days.

ITU Radio Regs., Art. 11.44B. Advancing a novel interpretation of the word "capability," Spectrum Five contends that to bring into use the BERMUDASAT-1 filing, "the U.K. needed to place a satellite at 96.2° W.L. that was 'capab[le] of transmitting or receiving that frequency assignment,' . . . meaning, among other things, that the satellite had lawful domestic authority to operate." Pet'r's Br. 33–34. Spectrum Five's interpretation of "capability" to include "lawful domestic authority" is contrary to its ordinary meaning. *FTC v. Tarriff*, 584 F.3d 1088, 1090 (D.C. Cir. 2009) ("It is fixed law that words of statutes or regulations must be given their ordinary, contemporary, common meaning.") (quotation marks omitted). Capability means "power or ability," not legal authority. *See, e.g.*, NEW OXFORD AM. DICTIONARY 252 (2d ed. 2005) (defining "capable" as one's "power or ability," and "capabilities" as "the extent of someone's or something's ability").

And even more importantly, Spectrum Five's interpretation makes little sense when interpreting capability in the context of Article 11.44B. *See, e.g.*, *Gonzales v. Carhart*, 550 U.S. 124, 152 (2007) ("In interpreting statutory texts courts use the ordinary meaning of terms unless context

requires a different result."); *Blackmon-Malloy v. U.S. Capitol Police Bd.*, 575 F.3d 699, 708 (D.C. Cir. 2009) ("[C]ourts should construe statutory language in accord with its ordinary or natural meaning, in the context of the statutory scheme, since statutory language, plain or not, depends on context.") (citations and quotation marks omitted). By using the preposition "of," Article 11.44B prescribes a specific, *technical* capability that is required of space stations: a space station must be capable "of transmitting or receiving that frequency assignment." ITU Radio Regs., Art. 11.44B.

In further support of its position, Spectrum Five cites a January 2013 ITU letter to "administrations of Member States of ITU," which elaborates upon the requirements of Article 11.44B. Pet'r's Addendum at 9. Spectrum Five points to the fact that the ITU may request "the satellite network operators' license application to the administration." *Id.* Even though the ITU mentions the license *application* and not the actual *license*, in Spectrum Five's view this indicates that the ITU wants to know whether the satellite operator had lawful domestic authority. Spectrum Five's reliance on this letter is misplaced because it has, again, ignored the context of the letter. The relevant paragraph of the letter states:

In order to avoid possible misinterpretation of the meaning of "with the capability of transmitting or receiving that frequency assignment" and to elaborate on the manner in which the [ITU Radiocommunication] Bureau would apply this provision, the [ITU Radiocommunication] Bureau has developed a non-exhaustive list of possible types of information that might be requested *to verify the transmitting and receiving capability of a satellite*, once the notified [date of bringing into use] has been received[.]

*Id.* at 9 (emphasis added). Read in its proper context, the ITU's purpose for requesting this information is to confirm the space station's technical capabilities. And, as one would expect, the non-exhaustive list includes documents that describe the satellite's technical capabilities—for example, the "manufacturer-provided and certified frequency plan for the satellite." *Id.* Thus, even though the record does not indicate the precise information that is included in a satellite network operator's license application, the logical inference we draw from the ITU's repeated focus on the satellite's "transmitting and receiving" capabilities is that an operator's license application likely includes such information. We therefore reject Spectrum Five's argument that the ITU will likely consider EchoStar 6's licensing relevant to whether it had the "capability" required under Article 11.44B.

But even if this uncertainty concerning the relevance of domestic authority to the ITU does not, standing alone, render Spectrum Five's claim insufficiently likely of redress, it clearly does when considered in combination with other aspects of the ITU's decision making process. In a May 2012 ITU letter to member nations, the ITU addressed bringing into use a frequency assignment through "satellite leasing," which occurred here.[9] The ITU explained that the responsible

---

[9] As discussed above, *see supra* Part I, because EchoStar 6 was initially launched in July 2000 pursuant to FCC authority, the United States (acting through the FCC) remained the responsible administration. *See STA Order*, 28 FCC Rcd at 10415 ¶ 8 (explaining "the basis for U.S. involvement in the authorization of the EchoStar 6 operations at the W.L. orbital location"). And as recounted above, as part of the coordination agreement between EchoStar and DIRECTV, the United States (through the FCC) would not raise any objections with the ITU regarding the BERMUDASAT-1 filing.

administration has 90 days to make any objections to the use of its space station:

> Regarding satellite leasing, WRC-12 [The World Radiocommunication Conference, Geneva, 2012] recognizes that an administration can bring into use, or continue the use of, frequency assignments for one of its satellite networks by using a space station which is under the responsibility of another administration or intergovernmental organization, provided that this latter administration or intergovernmental organization, after having been informed, does not object, *within 90 days from the date of receipt of information*, to the use of this space station for such purposes.

Pet'r's Addendum at 5 (emphasis added). Based on the plain language of this letter, it is unclear to us whether an objection *after* the 90-day period would cause the ITU to even reconsider whether the U.K.'s filing had been brought into use, let alone ultimately suppress the filing. At oral argument we asked counsel for Spectrum Five whether the ITU has had an occasion to elaborate on the 90-day objection requirement, and counsel was not aware of this happening. Oral Arg. 12:40–13:30. On April 4, 2014, however, Spectrum Five filed a Rule 28(j) letter, *see* FED. R. APP. P. 28(j), that included correspondence from the ITU's Radiocommunication Bureau shedding light on this issue. In particular, the correspondence addressed the Netherlands' inquiry "concerning the bringing into use under No. 11.44B of the frequency assignments to the BERMUDASAT-1 satellite network at 96.2°W." Pet'r's April 4, 2014 28(j) Ltr. Ex. A, at 1. At the outset, the ITU stated that it "is not in a position to act upon and has no direct involvement in the regulatory and legal frameworks internally established by an

administration," and that "[i]rrespective of the outcome of the USA court case referred to in your telefax, the Bureau's consideration of the issue of satellite leasing would depend on information provided to the Bureau by the administrations involved and international regulations in force." *Id.* at 2. Of significance here, the ITU stated:

> [R]egarding the use of a space station of another administration . . . , the Bureau is of the view that it would have no option than to initiate an investigation on the regulatory status of a satellite network for which the recorded frequency assignments would have been brought into use by using a space station under the responsibility of another administration or intergovernmental organization if an objection to such use is communicated to the Bureau by the responsible administration. Such investigation could lead to a suitable modification or proposed cancellation of frequency assignments to a satellite network from the [Master International Frequency Register] for not having been brought into use within the required regulatory period, as the case may be.

*Id.* Notably, the Netherlands neither asked nor did the ITU address whether the 90-day objection rule would apply. And even if we make the speculative assumption that the 90-day rule does not apply, the correspondence makes clear only that if the "responsible administration" (the FCC on behalf of the U.S.) objects, then the ITU would initiate an investigation. That's it. Based on that investigation, the ITU may reaffirm its initial determination, or it "could" reach a different conclusion. There is no indication that vacatur of the *STA Order* would require the FCC to raise a post hoc objection before the ITU. And even if the FCC would object, all that accomplishes is to put Spectrum Five back to square one: the

ITU would *reconsider* its determination. Spectrum Five's burden is heavier than this. It must show that vacatur of the Commission's order will *significantly increase* the likelihood that the ITU will suppress the U.K.'s filing. *Evans,* 536 U.S. at 464; *Klamath Water*, 534 F.3d at 739.[10] Spectrum Five, however, has not "adduce[d] facts" demonstrating how the ITU reconsideration process works, much less demonstrating that the ITU would likely reach a different conclusion upon reconsideration. *U.S. Ecology*, 231 F.3d at 25.

Furthermore, this correspondence also renders inapposite the cases relied upon by Spectrum Five to satisfy the redressability requirement. *Americans for Safe Access v. Drug Enforcement Admin.*, 706 F.3d 438, 448 (D.C. Cir. 2013), *cert. denied*, 134 S. Ct. 267 (2013), and *cert. denied*,

---

[10] We note that Spectrum Five has not claimed a procedural injury as a result of the FCC's actions. When a petitioner asserts an injury arising from an alleged violation of their procedural rights, a "lesser showing of redressability suffices." *Renal Physicians*, 489 F.3d at 1278 (citing *Lujan*, 504 U.S. at 572 n.7). In procedural-injury cases, the claimed injury arises from an alleged failure on the part of the injury-causing party to adhere to a prescribed process in adjudicating the petitioner's substantive rights, rather than from the substantive decision itself. *Id*. Accordingly, the petitioner has standing "if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed" the petitioner. *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). *See also Sugar Cane Growers Cooperative of Fla. v. Veneman,* 289 F.3d 89, 94–95 (D.C. Cir. 2002) ("A [litigant] who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered."). Here, Spectrum Five seeks a specific, substantive result: removal of the BERMUDASAT-1 filing from the ITU Master International Frequency Register. Pet'r's Br. at 33. Thus, the lower standard of redressability does not apply.

134 S. Ct. 673, 187 L. Ed. 2d 422 (2013); *Town of Barnstable, Mass. v. FAA*, 659 F.3d 28, 32 (D.C. Cir. 2011). Unlike here, in those cases we concluded that the ultimate decision by the third party (*domestic* agency) not before the court depended significantly—if not solely—upon our ruling on the petitioner's challenge to the agency action before us. *See Americans for Sate Access*, 706 F.3d at 440; *Town of Barnstable*, 659 F.3d at 31–32. Here, in contrast, this Court would not have any impact on the ITU's reconsideration of its determination. As the ITU stated, its decision will depend on its independent assessment, "irrespective" of our views. Pet'r's April 4, 2014 28(j) Ltr. Ex. A, at 1. Thus, there is no causal link between our decision and the ITU's determination of the merits. We conclude, therefore, that Spectrum Five has not shown "that it is likely as opposed to merely speculative," *Klamath Water*, 534 F.3d at 738, that vacatur of the *STA Order* will redress its asserted injury.

## B.

Finally, we turn briefly to the four additional steps Spectrum Five asks us to take.[11] *See supra* Part II. None of these requested actions alters our conclusion.

---

[11] Spectrum Five asks this Court to direct the FCC to:

(1) notify[] the ITU that EchoStar 6 did not have lawful authority to operate at 96.2° W.L., (2) notify[] the ITU that, as a result, the United States does not consent to the U.K.'s use of EchoStar 6 to bring the BERMUDASAT-1 filing into use, (3) revok[e] its ratification of the coordination agreement privately negotiated among EchoStar, DIRECTV, and SES Bermuda, which was a prerequisite for the U.K.'s claim to have brought into use the BERMUDASAT-1 filing, and (4) inform[] the ITU that the BERMUDASAT-1 filing expired because EchoStar 6 was

Three of the four requests essentially ask us to direct the FCC to inform the ITU that the BERMUDASAT-1 filing was not brought into use. Even if we agreed we have authority to do so, this would lead only to the ITU reconsidering its prior determination, which falls short of Spectrum Five's burden of demonstrating redressability.

The remaining request asks us to order the FCC to revoke its ratification of the coordination agreement between EchoStar, DIRECTV, and SES. Pet'r's Br. 35–36. Again, even assuming we have the authority to require the FCC to revoke its ratification of the coordination agreement, granting this request—along with the other three requests—would not satisfy Spectrum Five's burden, because the May 2012 ITU letter does not indicate that an out-of-time, post-hoc "objection" by the FCC is likely to cause the ITU to remove the BERMUDASAT-1 filing from the ITU Master International Frequency Register. In sum, even if we reached a decision that is favorable to Spectrum Five, whether the ITU would reach a decision favorable to Spectrum Five and that redresses Spectrum Five's injury remains speculative.

### III.

For the foregoing reasons, we dismiss Spectrum Five's petition for lack of standing.

*So ordered.*

---

not successfully maintained at 96.2° W.L. by the April 14 deadline.

Pet'r's Br. at 35–36.