**CATHOLIC SOCIAL SERVICE,
et al., Appellants,**

v.

**Donna E. SHALALA, Secretary, Health
and Human Services.**

No. 92–5249.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 24, 1993.

Decided Jan. 11, 1994.

James C. Pyles, Washington, DC, argued the cause for appellants. With him on the brief was Jenny A. Brody.

Edward T. Swaine, Atty., U.S. Dept. of Justice, Washington, DC, argued the cause for appellee. With him on the brief were J. Ramsey Johnson, Acting U.S. Atty. at the time the brief was filed, Barbara C. Biddle, Atty., U.S. Dept. of Justice, Harriet S. Rabb, Gen. Counsel, Darrel J. Grinstead, Associate Gen. Counsel, Henry R. Goldberg, Litigation Deputy, and Gerard Keating, Atty., U.S. Dept. of Health and Human Services, Anthony J. Steinmeyer, Asst. Director of Appellate Staff, U.S. Dept. of Justice, entered an appearance.

Before: EDWARDS and SILBERMAN, Circuit Judges, and RESTANI,* Judge, United States Court of International Trade.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

A group of home health care providers appeal from the district court's dismissal of their suit challenging a Health and Human Services regulation on grounds that they lack standing. We agree with appellants as to their standing but nevertheless affirm the district court because appellants' substantive claim is not valid.

## I.

Appellants challenge a Medicare cost-limit rule promulgated by the Secretary of Health and Human Services in 1985. Under the Medicare Program, Congress undertook to reimburse, *inter alia,* home health services providers for the reasonable, actual costs of care delivered to Medicare beneficiaries. *See* 42 U.S.C. § 1395f(b). The Secretary, pursuant to his authority under 42 U.S.C. § 1395x(v)(1)(A), began promulgating regulations setting limits on the costs incurred by such providers that would be considered

"reasonable," and hence reimbursable, under Medicare. *See* 44 Fed.Reg. 12,509 (1979). On July 5, 1985, the Secretary promulgated a new cost-limit rule that changed the method by which compliance with the specified cost limits would be determined. Prior to the rule, a health provider's costs were measured on an aggregate basis for purposes of applying the cost limits. That meant that a provider whose costs were above the permissible limits for one type of discipline, for example physical therapy, would nevertheless not have its costs disallowed if its costs for other disciplines, and accordingly its aggregate costs, were below the limits. Under the new rule, however, cost limits were to be applied on a per discipline basis, a change that the Secretary acknowledged could result in cost disallowances for more than 70% of home health providers. *See* 50 Fed.Reg. 20,188 (1985). Although the Secretary published the rule on July 5, 1985, he specified that "[t]he schedule of limits is effective for cost reporting periods beginning on or after July 1, 1985." 50 Fed.Reg. 27,734 (1985). Accordingly, on its face, the rule appeared to apply retroactively.

Subsequent to the promulgation of this rule, we held, and the Supreme Court agreed, that the Medicare statute did not authorize the Secretary to promulgate retroactive cost-limit rules. *See Georgetown Univ. Hosp. v. Bowen,* 821 F.2d 750, 758–60, (D.C.Cir.1987), *aff'd,* 488 U.S. 204, 215, 109 S.Ct. 468, 475, 102 L.Ed.2d 493 (1988). We also concluded that the Administrative Procedure Act (APA), 5 U.S.C. § 553 (1988), generally prohibits the promulgation of so-called "legislative" rules retroactively, an issue that the Supreme Court did not reach. *See Georgetown,* 821 F.2d at 758, 488 U.S. at 216, 109 S.Ct. at 476 (Scalia, J., concurring).

A number of home health care providers, relying on those cases, filed suit in district court, challenging the rule's validity. During the pendency of the case, six of the providers, those with cost reporting periods beginning on July 1, 1985, entered into settlements with the Secretary. None of the remaining providers in the case had cost reporting peri-

* Sitting by designation pursuant to Title 28 U.S.C. § 293(a) (1988).

ods that began prior to the rule's promulgation.[1] On cross-motions for summary judgment, the district court, without reaching the rule's validity, dismissed the case on the grounds that appellants lacked standing to bring this challenge.[2] The court reasoned that "according to the plain language of the rule, the new limits ... did not apply to plaintiffs until the start of their new cost periods" and "[t]hus ... had only prospective effect as applied to [them]." Any financial "injury" the home health care providers suffered from the rule had no connection to its retroactive character, and, therefore, the court thought that under the APA the providers were not "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.

## II.

Appellants assert that the district court mischaracterized their substantive argument and that once their claim is properly understood it should also be recognized that they have standing to raise it. Although standing "*focuses* on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated,'" see, e.g., *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 484, 102 S.Ct. 752, 765, 70 L.Ed.2d 700 (1982) (quoting *Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968) (emphasis added)), a plaintiff's standing must be analyzed with reference to the particular claim made. See *International Primate Protection League v. Administrators of Tulane Educ. Fund,* 500 U.S. 72, ——, 111 S.Ct. 1700, 1704, 114 L.Ed.2d 134 (1991) ("[S]tanding is gauged by the specific common-law, statutory or constitutional claims that a party pres-

ents."). We think appellants are, therefore, correct. They have been quite deft in fashioning their claim so as to establish standing and to avoid pitfalls that would jeopardize their footing.

Appellants claim that the rule in question, which undeniably has retroactive aspects, is, as a matter of administrative law, *ultra vires* and *void ab initio.* It is as if the Secretary wrote the rule on a scratch pad, left it in her home, and never published it in the Federal Register. It follows, according to appellants, that the rule's retroactivity or defective aspects *affect them* because if the rule were *void ab initio* it would not be in effect for anyone and they would be entitled to greater reimbursement ($5 million more) from the government per the pre-rule cost-limit methodology. Appellants conceded forthrightly at oral argument that if they are wrong on their substantive administrative law claim—if the rule were not *void ab initio,* but only partially infirm and partially legal—then they lack standing to present a third-party claim on behalf of those providers against whom the rule has a specific retroactive impact.

The government challenges appellants' Article III injury and causation theory, stating that appellants' "account is deeply suspect [and] strain[s] every element of constitutional standing" because it "depends unabashedly on their attenuated theory that a rule which is effective retroactively as to any party is wholly invalid." Of course, as we have noted, appellants do not accept the proposition that the rule does not have a retroactive "effect" as to them, but, passing that dispute, if one takes out the adjectives and adverbs from the government's formulation, the government is not really contesting appellants' Article III standing.[3]

---

1. The appellants here had fiscal years beginning August 1, 1985, November 1, 1985, and January 1, 1986.

2. The Secretary, who raised the standing issue for the first and only time in the district court in a footnote to Defendants' Reply to Plaintiffs' Opposition to Defendant's Motion for Summary Judgment, suggested off-handedly that "the Court may find that plaintiffs lack standing." Because standing is a jurisdictional doctrine, the district court was, of course, obliged to consider the issue *sua sponte.*

3. The government's only Article III argument is that appellants cannot establish traceability "by equating their requested relief with the violation of law, in the face of plaintiffs' inability to establish a violation in their own regard." Accepting this argument would require us to pass on the merits of appellants' claim, not on their standing. See *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

The government's prudential standing argument is more substantial. It is based on two doctrines which federal courts have added to Article III standing requirements. A plaintiff's complaint must fall within the "zone of interests to be protected or regulated by the statute or constitutional guarantee in question," *Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970), and, as a corollary, "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (citations omitted).

The first doctrine, the zone of interests test, has given rise to a good deal of administrative law standing litigation. *See* 13 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, AND EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE, § 3531.7, at 516 (1984). Section 702 of the APA which limits judicial review to those "aggrieved by agency action *within the meaning of a relevant statute*" has been interpreted to incorporate the zone of interests limitations. *Data Processing,* 397 U.S. at 153–54, 90 S.Ct. at 830 (emphasis added). In other words, a plaintiff has to find in the statute under which he is making a substantive claim some indication that Congress wished—or at least tolerated—some sort of claim brought by that plaintiff to be entertained in federal court. Is he to be thought a suitable challenger?

It is argued that appellants are not suitable challengers because the defect in the regulation of which they complain is of no moment to them. The presumptive ban on retroactive rulemaking, drawn from both the Medicare Act and the APA itself, is designed to protect only those who would be directly affected by a retroactive aspect of a rule.

Appellants' substantive claim, however, is simply different than the government's description of the claim. Appellants argue that the principle of administrative law for which they contend necessarily assumes they fall within the zone of interests to be vindicated. If, as appellants argue, a rule that is retroactive in specific application is *ultra vires* and

*void ab initio,* it can only be because administrative law, drawn from the APA and judicial decisions, views any such rule as inherently offensive and that its offensiveness taints the entire existence of the rule and any application of it. Put another way, if the effective date of the rule is prior to the date of the rule's promulgation, it is retroactive *in character* and therefore retroactive as against any person covered by the rule. Appellants' substantive claim may be difficult to establish, but if correct—and one must assume the validity of a plaintiff's substantive claim at the standing inquiry, *Warth v. Seldin,* 422 U.S. at 500, 95 S.Ct. at 2206—appellants have standing. *Cf. Haitian Refugees Ctr. v. Gracey,* 809 F.2d 794, 811 n. 14 (D.C.Cir.1987).

It follows that appellants need not satisfy the third-party interest standard. Insofar as appellants themselves fall within the zone of interests of the implied ban on retroactive rulemaking, appellants seek to vindicate their *own* interests, not the rights of absent third parties. *See Haitian Refugees Ctr.,* 809 F.2d at 812 n. 15.

### III.

That brings us to the proposition of administrative law which we think appellants have standing to assert. To establish that proposition, to gain our acceptance of it, is quite another matter. Under the APA, as appellants rightfully point out, "a reviewing court *shall* hold unlawful and set aside agency action found to be in excess of statutory ... authority." 5 U.S.C. § 706(2)(C) (emphasis added). The "agency action" in question according to appellants is the whole rule; the government may not enforce a part of the rule that has a solely prospective effect, if another part gives the rule a retroactive character or taint. With considerable ingenuity, appellants point to an old Supreme Court case, virtually never cited, but not overruled: *United States v. Baltimore & O.R.R. Co.,* 284 U.S. 195, 203, 52 S.Ct. 109, 111, 76 L.Ed. 243 (1931).

*Baltimore,* a pre-APA case, arose out of a railroad petition to the Interstate Commerce Commission, asking it to permit the railroad

to charge its customers a higher "division" than that permitted under an agreement among the carriers.[4] "[O]n November 5, 1927, the Commission found the agreed division unfair" and ordered that the railroad should receive a division over four times greater than that provided under the agreement. *Id.* at 198, 52 S.Ct. at 109. The order stated that it should "take effect as of August 6, 1926, and shall continue in force until the further order of the commission." *Id.* Approximately four months after the filing of this first order, the Supreme Court decided *Brimstone R.R. & Canal Co. v. United States,* 276 U.S. 104, 48 S.Ct. 282, 72 L.Ed. 487 (1928), which held that the Commission had no power to order parties to adjust their agreed "joint rates . . . for any period prior to the final order." *Baltimore,* 284 U.S. at 199, 52 S.Ct. at 109. Accordingly, in May 1928, the Commission re-opened the proceedings that had led up to the November 1927 order. The Commission acknowledged that it had acted beyond its authority in issuing an order in November 1927, effective August 1926. Rather than issue a new order effective 30 days after the conclusion of the May 1928 proceeding,[5] however, the Commission reasoned that the original order "should have become effective on December 5, 1927," and issued a second order, this time directing the parties to pay to the railroad the previously ordered adjusted division, "effective December 5, 1927." That second order was issued on May 7, 1929. *See id.* at 200, 52 S.Ct. at 110. Before the Supreme Court, the railroad and the government argued that the November 1927 order, although issued retroactively, was nevertheless valid for the future. *See id.* at 196–197, 52 S.Ct. at 109. The Court disagreed, declaring both orders "invalid" and determining that "[t]he division as originally agreed by the carriers remained the lawful one," *id.* at 204, 52 S.Ct. at 111, even as to the periods subsequent to the second order's promulgation.

The Commission had no power to put this order into effect as of a prior day; no

future day was prescribed; the designated date was not a lawful one. Accordingly, the order did not become operative and was *wholly ineffective.*

284 U.S. at 203, 52 S.Ct. at 111 (emphasis added).

Unquestionably, the quoted language supports appellants' argument, but the case can be distinguished. The Court stressed that under the Transportation Act then in effect "'[o]rders . . . shall take effect . . . according as shall be prescribed in the order'" and that the order in question specified no valid prospective date upon which the order could take effect. *Baltimore,* 284 U.S. at 203, 52 S.Ct. at 111. More important, the Court's examination of the ICC's order led it to conclude that "[t]he order was not divisible" presumably because the ICC did not intend the order to be so read. *Id.* at 204, 52 S.Ct. at 111. The Court, therefore, determined that it had no choice but to declare the entire order "wholly ineffective" because it could not usurp the Commission's power to declare the effective date of its orders. *Id.* at 203, 52 S.Ct. at 111. The order before us, however, is drafted with the expectation that it will impact on providers in a rolling fashion; it applies to cost reporting periods beginning "on or after July 1, 1985." 50 Fed.Reg. 27,734 (1985). There is no apparent reason—appellants suggest none—why the Secretary should be thought to have intended the rule to have an all or nothing character. We see no indication that the Secretary would have even hesitated to promulgate the rule if he had understood that he was not able to apply it retroactively to July 1 but rather was obliged to make August 1 the "effective date." To be sure, the language in *Baltimore* is rather sweeping, but the varying cost years to which this rule applies provide a basis to treat the rule before us as divisible.

Furthermore, *Baltimore* was decided 20 years before the passage of the APA. The

---

4. A "division" was the portion of a through-rate paid to a carrier by a shipper that was owed to a railroad for use of its line.

5. The then-applicable Transportation Act provided: "all orders of the commission . . . shall take

effect within such reasonable time, not less than thirty days, and shall continue in force until its further order, or for a specified time, according as shall be prescribed in the order. . . ." *See Baltimore,* 284 U.S. at 203, 52 S.Ct. at 111.

APA definition of "agency action" obliges reviewing courts to carefully limit their review—perhaps more narrowly than did the *Baltimore* court. That definition, found in 5 U.S.C. § 551(13), is as follows: " 'agency action' includes the whole *or a part* of an agency rule, order, ... or the equivalent...." 5 U.S.C. § 551(13) (emphasis added). This means that the "agency action ... found to be in excess of statutory ... authority," 5 U.S.C. § 706(2)(C), can encompass only "a part of an agency rule." And courts may "set aside" only the part of a rule found to be invalid—for that is the only "agency action" that exceeds statutory authority. It would, therefore, exceed the statutory scope of review for a court to set aside an entire rule where only a part is invalid, and where the remaining portion may sensibly be given independent life.[6]

We expressed just such an understanding of the APA recently in *Prows v. Department of Justice,* 938 F.2d 274 (D.C.Cir.1991). Faced with a challenge to a regulation based on DOJ's "violation of the [APA's] requirement that an agency allow passage of 30 days between a final rule's publication and its effective date[,] 5 U.S.C. § 553(d) (1988)," *Prows,* 938 F.2d at 275, we held that the violation is "remedied by denying such a rule effectiveness for the mandated 30 days, allowing it to take effect in full thereafter." *Id.* We explained that this approach "protects those who are affected by agency action taken during the 30–day waiting period without disturbing later action that is not the product of the violation." *Id.* at 276. Although appellants seek to distinguish *Prows* on the ground that the defect in the 1985 cost-limit rule is "far more fundamental" than the "procedural" defect in *Prows,* we are not persuaded. We have been shown nothing that suggests the rule is not severable. If the Secretary had promulgated two entirely separate rules on July 5th—one effective July 1 for providers with a cost reporting period beginning on that date, and

one effective on August 1 for providers with cost reporting periods beginning on August 1 and thereafter—it is beyond dispute that the latter rule would survive despite the former's retroactive nature. There is no meaningful distinction between that hypothetical and this case.

\*    \*    \*    \*    \*    \*

For the foregoing reasons, the judgment of the district court is affirmed.

*So ordered.*

---

**6.** Were *Baltimore* to arise today, the ICC's order would be considered an adjudication, not a rulemaking, *see Atchison, T. & S.F. R.R. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 806–08, 93 S.Ct. 2367, 2374–75, 37 L.Ed.2d 350 (1973) (plurality op.), and would permissibly have both retroactive and prospective effect, *see Clark–Cowlitz*

*Joint Operating Agency v. FERC,* 826 F.2d 1074, 1081–82 (D.C.Cir.1987), *cert. denied,* 485 U.S. 913, 108 S.Ct. 1088, 99 L.Ed.2d 247 (1988)—which emphasizes the case's anachronistic character. Perhaps it is also worth noting that Justices Holmes, Brandeis, and Stone dissented from *Baltimore.*