# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 25, 2015      Decided September 6, 2016

No. 14-5195

SCENIC AMERICA, INC.,
APPELLANT

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-00093)

*Daniel H. Lutz* argued the cause for appellant. With him on the briefs was *Hope M. Babcock. Thomas M. Gremillion* entered an appearance.

*William D. Brinton* was on the brief for *amici curiae* The American Planning Association, et al. in support of petitioner.

*Jeffrey E. Sandberg*, Attorney, U.S. Department of Justice, argued the cause for federal appellees. With him on the brief were *Ronald C. Machen Jr.*, U.S. Attorney at the time the brief was filed, and *Mark R. Freeman*, Attorney.

*Kannon K. Shanmugam* argued the cause for intervenor-appellee Outdoor Advertising Association of America, Inc. With him on the brief was *Allison B. Jones*.

Before: PILLARD and WILKINS, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: The Highway Beautification Act ("HBA"), 23 U.S.C. § 131, requires the Federal Highway Administration ("FHWA") and each state to develop and implement individual federal-state agreements ("FSAs"), detailing, among other things, "size, lighting and spacing" standards for the billboards now found towering over many of our country's interstate highways. One of those adopted standards, included in most states' FSAs, prohibits those states from erecting any billboard with "flashing, intermittent or moving" lights (the "FSA lighting standards").

Plaintiff-Appellant Scenic America is a non-profit organization which "seeks to preserve and improve the visual character of America's communities and countryside." Compl. ¶ 7, J.A. 10. It challenges a guidance memorandum issued by the FHWA in 2007, which interpreted that prohibition on "flashing, intermittent or moving" lights to permit state approval of those digital billboards that met certain timing and brightness requirements. Scenic argues that the guidance memorandum must be invalidated because it (1) was not promulgated using notice-and-comment procedures, and (2) violates the HBA, and was therefore promulgated "contrary to law" in violation of § 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq*.

We hold that we lack jurisdiction to hear Scenic's notice-and-comment claim because Scenic has failed to demonstrate that it has standing to bring that challenge, and deny its § 706 claim on the merits.

**I.**

**A.**

In 1965, Congress enacted the Highway Beautification Act to control "the erection and maintenance of outdoor advertising signs, displays, and devices in areas adjacent to the Interstate System . . . in order to protect the public investment in such highways, to promote the safety and recreational value of public travel, and to preserve natural beauty." 23 U.S.C. § 131(a). The HBA penalizes those states that fail to maintain "effective control" over their advertising signs by permitting the Secretary of Transportation to reduce their federal highway funds by ten percent. *Id.* § 131(b).

To maintain effective control, each state is required to, among other things, negotiate an FSA with the Secretary that establishes standards for the "size, lighting and spacing" of billboards that come within 660 feet of the Interstate. *Id.* § 131(d). The HBA requires that those standards be "consistent with customary use." *Id.* All fifty states entered into such FSAs, most of which were written in the 1960s and 1970s. *See Scenic Am., Inc. v. U.S. Dep't of Transp.* (*Scenic II*), 49 F. Supp. 3d 53, 57 (D.D.C. 2014). FHWA regulations, promulgated under the HBA, require that states "[d]evelop laws, regulations, and procedures" that implement the standards contained in each state's FSA. 23 C.F.R. § 750.705(h). States must submit these laws, regulations, and procedures to the FHWA's regional offices,

known as Division Offices, for approval. *Id.* § 750.705(j). The FHWA has one Division Office located in each state.

Although each of the FSAs was individually negotiated, most contain similar terms. Nearly all of the FSAs contain a prohibition against "flashing," "intermittent," and "moving" lights. *See, e.g.*, J.A. 120 (New York FSA); J.A. 131 (Colorado FSA); J.A. 139 (North Carolina FSA).

As billboard technology changed, states began considering or passing laws that permitted digital billboards to be displayed along the Interstate. *See, e.g.*, J.A. 422-23 (letter from Indiana Department of Transportation to Indiana FHWA Division Office informing the Division Office that Indiana had passed a law permitting certain digital billboards); J.A. 424 (letter from the Indiana FHWA Division Office to the Indiana Department of Transportation acknowledging the letter and agreeing that the digital billboards discussed in Indiana's previous letter "do[] not constitute flashing, intermittent or moving lights"); J.A. 437 (letter from Arkansas Highway Commission to Arkansas FHWA Division Office noting new regulations permitting digital billboards); J.A. 183 (United States Department of Transportation memorandum discussing digital billboard in Nebraska). These billboards, sometimes referred to as "commercial electronic variable message signs" ("CEVMS"), typically use LED lights to display a static advertisement that remains on the screen for a specified period of time before quickly transitioning to a different static advertisement. Advertisements typically remain visible for around ten seconds, and usually take approximately two seconds to transition to the next ad.

The FHWA's Division Offices differed on whether digital billboards complied with the FSA lighting standards.

*Compare, e.g.*, J.A. 424 (Indiana Division Office agreeing that digital billboards "do[] not constitute flashing, intermittent or moving lights"), *with, e.g.*, J.A. 263 (Texas Division Office stating that "[w]hile the technology for LED displays did not exist at the time of the [FSA], the wording in the [FSA] clearly prohibits such signs"). In 2007, the national FHWA office weighed in. It issued to its Division Offices a memorandum entitled "Guidance on Off-Premise Changeable Message Signs" (the "Guidance" or "2007 Guidance"), a portion of which stated as follows:

> Proposed laws, regulations, and procedures that would allow permitting CEVMS subject to acceptable criteria (as described below) do not violate a prohibition against "intermittent" or "flashing" or "moving" lights as those terms are used in the various FSAs that have been entered into during the 1960s and 1970s.

J.A. 535. The FHWA went on to identify those "acceptable criteria" based on "certain ranges of acceptability that have been adopted in those States that do allow CEVMS." J.A. 534, 537 (recommending, among other things, that each display generally remain static for between four and ten seconds, and transition to a new display in one to four seconds).

According to a survey the FHWA distributed to states shortly before issuing the 2007 Guidance, many states with FSAs that included a ban on intermittent, flashing, or moving lights permitted digital billboards before the FHWA issued the Guidance. J.A. 531-32. The Division Office for at least two states, Texas and Kentucky, did not permit digital billboards prior to the 2007 Guidance. *See Scenic Am., Inc. v. U.S. Dep't of Transp.* (*Scenic I*), 983 F. Supp. 2d 170,

179-80 (D.D.C. 2013). After the Guidance, Texas began to permit the use of digital billboards. Lloyd Decl. ¶ 9, J.A. 41.

**B.**

Scenic brought this suit against the United States Department of Transportation, the federal executive department responsible for implementation of the HBA; the FHWA, which promulgated the 2007 Guidance; Ray LaHood, the Secretary of Transportation at the time; and Victor Mendez, the Administrator of FHWA at the time. Scenic did not include any of the FHWA's Division Offices in this suit. Outdoor Advertising Association of America, Inc. ("OAAA") intervened as a defendant shortly after Scenic brought suit.

Scenic's suit alleges two claims relevant to this appeal: (1) the 2007 Guidance constitutes a legislative, not interpretive rule, thus violating § 553 of the APA, because it was not promulgated using notice-and-comment procedures; and (2) the Guidance violates § 706 of the APA because it creates a new lighting standard that is not "consistent with customary use," as required by the HBA.[1] Compl. ¶¶ 48-53, 57-62, J.A. 17-19.

The FHWA and the OAAA (collectively "Defendants") moved to dismiss, contending that Scenic lacked standing, and that the court lacked jurisdiction over the Guidance

---

[1] Scenic abandoned a third claim on appeal – that the Guidance improperly creates new lighting standards, in contravention of the procedures for creating new standards set forth in the HBA. *See* Br. for Defendants-Appellees [hereinafter "FHWA Br."], Scenic Am., Inc. v. U.S. Dep't of Transp., No. 14-5195 (D.C. Cir. Feb. 20, 2015), Doc. No. 1538780, at 16 & n.7.

because it did not constitute final agency action under the APA. *Scenic I*, 983 F. Supp. 2d at 172-73. The District Court denied Defendants' motion as to both claims. *Id.*

Relevant to our decision here, the District Court held, at the motion to dismiss stage, that Scenic's requested relief would redress its harm because "vacating the Guidance would return the FHWA to agnosticism on the question [of permitting digital billboards], leaving Division Offices free to draw their own conclusions." *Id.* at 181. According to the District Court, this would prevent Scenic from "hav[ing] to police as intensively new digital-billboard construction around the country." *Id.*

Defendants later moved for summary judgment, and the District Court granted the motions, finding that the Guidance was not subject to notice-and-comment requirements because it was an interpretive, not legislative rule, and that it did not violate the "consistent with customary use" provision of the HBA. *Scenic II*, 49 F. Supp. 3d at 59-71. Defendants, in their summary judgment briefing below, did not again challenge Scenic's standing, and the District Court did not discuss Scenic's standing in its written Opinion granting Defendants' summary judgment motions.

## II.

We begin, as we must, by addressing our jurisdiction to review Scenic's appeal. Because Scenic must demonstrate its standing separately as to each of the two claims it brings on appeal, *see Catholic Soc. Serv. v. Shalala*, 12 F.3d 1123, 1125 (D.C. Cir. 1994), we find that, although Scenic has standing to bring its claim concerning FHWA's alleged § 706 violation, Scenic has failed to demonstrate it has standing to bring its notice-and-comment claim.

8

## A.

As has been expressed time and time again, "[f]ederal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986). As Chief Justice Marshall observed, "[i]f the judicial power extended to every question under the constitution it would involve almost every subject proper for legislative discussion and decision [and] if to every question under the laws and treaties of the United States it would involve almost every subject on which the executive could act." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (quoting 4 PAPERS OF JOHN MARSHALL 95 (C. Cullen ed. 1984)) (emphases omitted). Thus, without studious adherence to the metes and bounds of our jurisdiction as imposed by Article III, Chief Justice Marshall warned that "the other departments [of the government] would be swallowed up by the judiciary." *Id.* The standing requirements of Article III are therefore grounded in respect for the separation of powers tenets that are the foundation of our system of government, *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471-74 (1982), and they help "prevent the judicial process from being used to usurp the powers of the political branches," *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013). Observing our Article III limitations is therefore always important, and particularly so in a case such as this, where we are asked to invalidate an action of the Executive branch.

The "irreducible constitutional minimum of standing" requires that a plaintiff demonstrate three elements: (1) injury in fact; (2) causation; and (3) redressability. *Lujan v. Defs.*

*of Wildlife*, 504 U.S. 555, 560-61 (1992). "The party invoking federal jurisdiction bears the burden of establishing these elements"; "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561.

Thus, the plaintiff must meet this burden at the outset of *each* phase. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice . . . ." *Id.* And a court's determination that a plaintiff has established standing at the motion to dismiss stage by *alleging* sufficient facts in her pleadings is only the first step, because that finding does not obviate the court's responsibility to ensure that the plaintiff can actually *prove* those allegations when one or both parties seek summary judgment. So even where the court denies a motion to dismiss based on lack of standing, "[i]n response to a summary judgment motion, . . . the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts [establishing standing]." *Id.* (internal quotation marks omitted).[2] If, upon review of the

---

[2] Our treatment of standing in cases that come to us directly on administrative review is instructive. Because these petitions for administrative review bypass the district court and come to us directly, we treat them as a district court would in deciding a motion for summary judgment. *See Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002). In *Sierra Club*, we held, "mindful of our independent obligation to be sure of our jurisdiction," that the petitioner there had failed to establish its burden as to standing. *Id.* at 898, 902. We explained that "[t]he petitioner's burden of production in the court of appeals is . . . the same as that of a plaintiff moving for summary judgment in the district court: it must

evidence, the court determines that the plaintiff has not introduced sufficient evidence into the record to at least raise a disputed issue of fact as to each element of standing, the court has no power to proceed and must dismiss the case. *See, e.g.*, *Clapper*, 133 S. Ct. at 1148-49 (dismissing case where plaintiff did not raise an issue of fact as to standing at summary judgment).

In addition, "every federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review.'" *Bender*, 475 U.S. at 541 (quoting *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934)). If we determine that the District Court was without jurisdiction, then "we have jurisdiction on appeal, not of the merits but merely for the purpose of correcting the error of the lower court in entertaining the suit." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 73 (1997)).

We review the District Court's decision (or lack thereof) as to standing *de novo*, *Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003), and hold that Scenic has not met its burden of

---

support each element of its claim to standing 'by affidavit or other evidence.'" *Id.* at 899 (quoting *Defs. of Wildlife*, 504 U.S. at 561).

Just as we must ensure our jurisdiction over petitions brought to us directly, so too must the district court assure itself of its jurisdiction before assessing a summary judgment motion on the merits.

establishing its standing to bring its notice-and-comment claim.[3]

---

[3] The FHWA challenged Scenic America's standing at the motion to dismiss stage, and though the District Court held in favor of Scenic, it noted that the issue "presents difficult and close questions." *Scenic I*, 983 F. Supp. 2d at 172. When the FHWA later moved for summary judgment, therefore, Scenic was already on notice that its standing might be questioned on appeal, at which time the record would be closed. Scenic therefore cannot claim to have been deprived of a fair and "full opportunity to make a record of [its] standing in the district court." *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 241 (D.C. Cir. 2015). Scenic should have accompanied its summary judgment materials with evidence of its standing. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 897 (1990) ("[A] litigant's failure to buttress its position because of confidence in the strength of that position is always indulged in at the litigant's own risk.").

Because the plaintiff has the burden to establish the evidentiary basis for its standing at the summary judgment stage *in every case*, just as it has the burden to plead sufficient facts at the motion to dismiss stage *in every case*, the District Court may wish to consider amending its local rules to provide that the plaintiff include its evidentiary basis for standing in the statement of material facts that every party is required to file either in support of, or in opposition to, a motion for summary judgment. *See* Civil Local Rule 7(h)(1). Such a rule would ensure that the plaintiff is on notice of its obligation to present such evidence, make the District Court's job much easier (as well as ours), and function similarly to our Circuit Rule 28(a)(7), which we adopted after our ruling in *Sierra Club*.

12

**B.**

**1.**

Scenic's notice-and-comment claim turns on the redressability prong of Article III standing. Scenic asserts that the 2007 Guidance forced certain FHWA Division Offices to reinterpret the FSA lighting standards – that billboards may not contain "flashing, intermittent or moving" lights – so that those offices would thereafter find the FSA language to permit, rather than bar, digital billboards. Scenic claims that this alleged change of position made it easier for states to erect digital billboards, because they no longer had to worry about being prevented from doing so by the Division Offices. As a result, Scenic allegedly has to work harder, and thus spend greater resources, to fight these billboards – its injury in fact. Scenic claims that vacating the Guidance will redress that injury.

In this way, Scenic asserts injuries that stem not directly from the FHWA's issuance of the 2007 Guidance, but from third parties not directly before the court – the Division Offices and the states. When "[t]he existence of one or more of the essential elements of standing" – in this case redressability – "'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict,'" it becomes "'substantially more difficult' to establish" standing. *Defs. of Wildlife*, 504 U.S. at 562 (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989); *Allen v. Wright*, 468 U.S. 737, 758 (1984)); *accord Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004). "[M]ere 'unadorned speculation' as to the existence of a relationship between the challenged government action and the third-party conduct 'will not suffice

to invoke the federal judicial power.'" *Nat'l Wrestling*, 366 F.3d at 938 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976)).

Scenic's complaint makes only two arguments concerning the redressability of its notice-and-comment claim. First, it argues that if we vacate the 2007 Guidance, "Scenic America and its affiliate members would spend fewer resources combating new digital billboards." Compl. ¶ 21, J.A. 12. This speaks to Scenic's alleged organizational standing. *See PETA v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (organizational standing "requires [an organizational plaintiff], like an individual plaintiff, to show actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision" (internal quotation marks omitted)). Second, Scenic contends that if we vacate the 2007 Guidance, "digital billboards that injure Scenic America members would be subject to removal or an order to cease operating in a manner that violates the regulatory prohibition against intermittent lighting in billboard advertisements." Compl. ¶ 21, J.A. 12. This speaks to Scenic's representational standing. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (recognizing "that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit").

14

**2.**

**a.**

Scenic has failed to demonstrate that our vacatur of the Guidance would redress its alleged organizational injury – that it is forced to expend greater resources fighting digital billboards because the 2007 Guidance makes it easier for states to erect such billboards.

States are required to seek permission from the FHWA Division Offices before they permit the use of digital billboards. *See* 23 C.F.R. § 750.705(j). Prior to the FHWA's issuance of the Guidance, those Offices could, and often did, authorize that use, finding that it accorded with a given state's FSA. Scenic has introduced no evidence into the record – as it must at summary judgment – establishing that if we were to vacate the Guidance, any Division Office would respond by preventing the state it oversees from erecting digital billboards; nor has Scenic submitted evidence establishing that states would successfully erect, or even seek to erect, fewer billboards. Without providing any indication that our vacatur of the Guidance will diminish the number of billboards Scenic has to fight, Scenic has failed to demonstrate that its requested remedy would prevent Scenic from having to expend the same amount of resources fighting these billboards.

A brief look at some of our previous decisions in this area reinforces the point. In *National Wrestling*, we assessed the standing of several associations representing men's wrestling teams, some of whom had been cut from college athletic programs. 366 F.3d at 933. Department of Education regulations, promulgated under Title IX, required college athletic programs to ensure that they provided equal athletic opportunities to both sexes, based in part on the resources that are devoted to various programs. *Id.* at 934-35. Plaintiffs did

not challenge those regulations. Instead, plaintiffs challenged a Department of Education interpretation of those regulations, which they claimed caused several athletic programs to eliminate their wrestling teams. *Id.* We held that plaintiffs lacked standing because they were unable to show that a favorable decision would redress their injuries. *Id.* at 938.

We noted that the "direct causes of appellants' asserted injuries – loss of collegiate-level wrestling opportunities for male student-athletes – are the independent decisions of educational institutions." *Id.* at 936-37. Even if we vacated the Department of Education's interpretation, there was no indication that it would alter those institutions' independent decisions to eliminate their wrestling teams. *Id.* at 939. Nothing in the Department's interpretation required schools to eliminate their wrestling teams; schools did so in an attempt to ensure that they were distributing athletic resources equally – a requirement of Title IX more generally, irrespective of the interpretation that plaintiffs challenged. *See id.* at 939-40 (asserting that "nothing but speculation suggest[ed] that schools would act any differently" if the court vacated the interpretation). We noted that plaintiffs would only meet standing requirements if they "took the position that gender-conscious elimination of men's sports teams would be illegal in the absence of the challenged" interpretation, but that plaintiffs made no such claim. *Id.* at 941. Finally, we explained that the "possibility" that wrestling teams would have "better odds" if we vacated the Department's interpretation "falls far short of the mark." *Id.* at 942 (emphasis omitted).

We held similarly in *Renal Physicians Ass'n v. United States Department of Health and Human Services*. 489 F.3d 1267 (D.C. Cir. 2007). That case involved the Stark Law, which limited the ability of a physician to refer a Medicare

patient to clinical laboratories with which the physician had a "financial relationship," but permitted referrals where the physician's only financial interest was the receipt of compensation at "fair market value." *Id.* at 1269. The Department of Health and Human Services, which was authorized to promulgate regulations under the Law, created a "safe harbor" provision, describing two methods for demonstrating that a physician's hourly rate was at fair market value. *Id.* at 1270. The Department also noted, however, that the safe harbor was voluntary, and that health care providers could continue to establish fair market value through other methods. *Id.* at 1269-71.

After a physicians' association challenged the safe harbor provision under the APA, we held that plaintiff lacked standing because it failed to show that vacating the safe harbor provision would redress its members' alleged injuries – namely that the safe harbor provision caused them to be paid less for their services than would otherwise be the case. *Id.* at 1276-78. Because the safe harbor was merely one way that hospitals could determine "fair market value," we noted that "it is 'speculative,' rather than 'likely,' that invalidating the safe harbor will somehow cause these facilities to pay more," and that "[t]he effect (if any) of the safe harbor cannot be simply undone." *Id.* at 1277.

As in *Renal Physicians*, the FHWA created what is, in essence, a safe harbor provision regarding digital billboards. The 2007 Guidance made it clear that state laws and regulations regarding digital billboards meeting the specifications listed in the Guidance would not be rejected for violating the FSA lighting standards. Yet even after the Guidance, Division Offices can still approve state laws and regulations permitting billboards that fall outside those specifications, and they can still reject laws and regulations

allowing billboards that meet those specifications, but that violate state FSAs for other reasons. The safe harbor created by the Guidance is voluntary in the same way as the safe harbor in *Renal Physicians*; Division Offices can rely on it to find certain billboards permissible, but those Offices can find those billboards permissible for other reasons as well. It is "speculative," rather than "likely," that invalidating the Guidance would stop any particular billboard from being constructed. Indeed, many states with FSAs that included a ban on intermittent, flashing, or moving lights permitted digital billboards prior to the 2007 Guidance.

In sum, we cannot assume, without more, that vacating the Guidance would eliminate or lessen the construction of digital billboards.

Scenic contends that because the Texas Division Office barred Texas from constructing digital billboards prior to the Guidance, vacating the Guidance would redress Scenic's injuries, at least with respect to Texas. However, Scenic has introduced no evidence suggesting that Texas, or the Texas Division Office, would behave any differently in the absence of the 2007 Guidance. Scenic simply assumes, without any proof, that Texas will revert to its pre-Guidance position as soon as the Guidance is invalidated.

Scenic's assumption is nothing more than "unadorned speculation." *Simon*, 426 U.S. at 44. Several other possibilities seem just as likely, were we to vacate the 2007 Guidance. The Guidance may have focused the Texas Division Office on the fact that a majority of states had already determined that the FSA lighting standards permitted digital billboards. Knowing as much, Texas's Division Office might be more inclined to "jump on the bandwagon" and permit such billboards going forward, even absent the

2007 Guidance. Or the Division Office might be persuaded to continue allowing digital billboards now that Texas has already issued permits for at least 150 of them, Lloyd Decl. ¶ 9, J.A. 41. *See Renal Physicians*, 489 F.3d at 1278 ("[T]he word is already out, and therefore it is too late to reverse course. . . . [T]he undoing of the governmental action will not undo the harm, because the new status quo is held in place by other forces.").

Scenic has introduced no evidence that would make any one of these possibilities more likely than another. Particularly given the difficulty of establishing standing based on the actions of third parties not before the Court, *see Defs. of Wildlife*, 504 U.S. at 562, Scenic's lack of any evidentiary basis for its redressability contentions requires us to reject its standing as to its notice-and-comment claim.

As a final argument, Scenic relies on *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), and contends that vacating the 2007 Guidance would remove one of several barriers to Scenic's anti-digital billboard efforts, and that this is sufficient for redressability purposes. However, *Arlington Heights* is inapposite here.

As an initial matter, *Arlington Heights* involved a party directly harmed by the challenged action, not one harmed by the actions of a third party not before the Court. *See id.* at 254. Moreover, *Arlington Heights* involved a developer's challenge to a zoning ordinance that prevented it from building low-income housing. *Id.* at 255-58. The Supreme Court characterized the zoning ordinance as an "absolute barrier." *Id.* at 261. Although the developer still needed to secure financing and qualify for federal subsidies, the challenged zoning ordinance ensured that the developer could

not proceed with its goal of constructing low-income housing. *Id.* at 261-62. A court decision to remove that barrier would redress the developer's injury because a major impediment to the developer's efforts would be eliminated.

Scenic has introduced no evidence showing that vacating the 2007 Guidance would remove an "absolute barrier" to its efforts. As we have already stated above, absent the 2007 Guidance, states remain free to pursue digital billboard construction, and Division Offices remain free to permit such construction. Thus, Scenic has not established that invalidating the Guidance would improve or ease Scenic's efforts in any way.[4]

**b.**

Scenic's representational standing claim fares no better. Scenic argues that vacating the 2007 Guidance will redress its members' injuries because it will cause the digital billboards allegedly injuring those members to be removed. Compl. ¶ 21, J.A. 12. Scenic came dangerously close to forfeiting this argument. *See Huron v. Cobert*, 809 F.3d 1274, 1279-80 (D.C. Cir. 2016).

Presumably because the District Court had upheld Scenic's standing at the motion to dismiss stage, and Defendants had not contested Scenic's standing before the

---

[4] Scenic did not argue that the FHWA's failure to undertake notice and comment before promulgating the Guidance constitutes a procedural injury, and we express no opinion on such an argument. Although a party cannot forfeit a claim that we lack jurisdiction, it can forfeit a claim that we possess jurisdiction. *See Huron v. Cobert*, 809 F.3d 1274, 1279-80 (D.C. Cir. 2016).

District Court at the summary judgment stage, Scenic did not address its standing in its opening brief on appeal. In their responding brief, however, the FHWA challenged anew Scenic's standing. The FHWA contended that Scenic had offered "no basis for expecting that vacating the Guidance would cause any existing digital billboards to be dismantled." *See* FHWA Br. 29. In reply, Scenic appeared to abandon the allegation. It repeated the FHWA's contention and responded that "Plaintiff need only show that vacatur would reduce Plaintiff's continuing injury of diverting limited resources to counteract billboard approvals." Reply Br. for Appellant 10.

Nonetheless, Scenic appears to have preserved its representational standing argument by painting it in a somewhat different light. It argues that the alleged injuries of one of its members – Nikki Laliberte – are "traceable to the Guidance" because the Guidance prohibits the Division Office in Minnesota, where Laliberte lives, from considering whether digital billboards violate the FSA lighting standards. *See* Reply Br. for Appellant 12. Scenic's implication seems to be that vacating the Guidance might cause Minnesota's Division Office to remove some digital billboards. Although Scenic's argument is couched in terms of causation, "causation and redressability are closely related, and can be viewed as two facets of a single requirement." *Newdow v. Roberts*, 603 F.3d 1002, 1012 n.6 (D.C. Cir. 2010) (internal quotation marks omitted). Thus, Scenic's assertion is sufficient to preserve its representational standing claim.

As we noted above, however, Scenic has introduced no evidence demonstrating that our vacatur of the Guidance would cause Division Offices or states to prohibit the construction of new digital billboards. *See supra* Part II.B.2.a. It is even less plausible, given Scenic's complete lack of any evidentiary showing on the matter, that Division

Offices or states would require extant billboards to be dismantled.

By neglecting to "set forth by affidavit or other evidence specific facts" establishing its representational standing, *Defs. of Wildlife*, 504 U.S. at 561 (internal quotation marks omitted), Scenic has failed to meet its burden to demonstrate its representational standing to bring its notice-and-comment claim.

**3.**

Scenic does fare better, however – at least as to standing – on its claim that the Guidance violated § 706, although barely.

**a.**

In its complaint, Scenic alleges that FHWA's actions, in promulgating the Guidance, are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA." Compl. ¶ 62, J.A. 19. That language appears to be taken from § 706(2)(A) of the APA, which sets forth the well-known "arbitrary and capricious" standard, and which would likely provide an effective cause of action for Scenic to challenge the FHWA's alleged failure to comport with the HBA. Confusingly, however, Scenic does not cite § 706 as part of its second claim, but rather cites § 553, the provision that concerns notice-and-comment rulemaking. *See id.* ¶¶ 57-62, J.A. 18-19.

Construing the complaint liberally, as is sometimes appropriate, *but cf. Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1104, 1106 (D.C. Cir. 2005) (explaining that although "the complaint – particularly a complaint filed by a pro se prisoner – should be construed liberally," "the rule of liberal construction of complaints applies to factual allegations," and

refusing to liberally construe a counseled plaintiff's complaint so as to include new defendants (quoting *Fletcher v. District of Columbia*, 370 F.3d 1223, 1227 n.\* (D.C. Cir. 2004))), it might be possible to construe Scenic's complaint as having relied upon § 706 rather than, or in addition to, § 553. At oral argument, however, counsel for Scenic was specifically asked whether its second claim included a § 706 challenge to FHWA's promulgation of the guidance, and Scenic's counsel replied "no, we did not present that." Counsel went on to state that to the extent it brought anything resembling an arbitrary-and-capricious challenge it did it through the "backdoor" of its notice-and-comment claim, specifically highlighting its argument that that the Guidance is a legislative rule because it is 180 degrees counter to the FSA text it alleged to be interpreting. Thus, it appears that Scenic disclaimed any arbitrary-and-capricious challenge to FHWA's alleged failure to comport with the HBA.

Nonetheless, during that same colloquy at oral argument, Scenic did state, with respect to its § 706 claim, that it "focused solely on the customary use provision, finding that it was contrary to law." Giving Scenic the benefit of the doubt, Scenic's papers and statements at oral argument are sufficient for us to eke out a § 706 claim.

**b.**

Scenic has standing to bring such a § 706 claim. First, Scenic has offered sufficient evidence that it has suffered a representational injury in fact. The record at summary judgment demonstrates that at least one of its members, Nikki Laliberte, has suffered a concrete injury because a digital billboard near her home "generates a bright flash when its display transitions from one advertisement to another." Laliberte Decl. ¶ 4, J.A. 52. She asserts that the billboard "has

marred the view from [her] home[],” and that she is “concerned that the billboard has negatively affected the value of [her] property.” *Id.* ¶¶ 6, 9, J.A. 52-53. This sort of harm to an individual’s property is sufficient to constitute a concrete injury in fact. *See Idaho, By & Through Idaho Pub. Utils. Comm’n v. ICC*, 35 F.3d 585, 591 (D.C. Cir. 1994) (noting that a private landowner “suffers concrete injury if [her] property is despoiled”).

The causation and redressability prongs of our standing analysis are equally clear here. Scenic’s § 706 claim is that the Guidance runs afoul of the statute’s “customary use” requirement as that requirement has been interpreted in the FSAs. If we were to find for Scenic on the merits of its claim, a point we must assume for standing purposes, *see LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011), we could only do so by effectively repudiating the FHWA’s interpretation of the FSAs. Repudiation would provide much more robust relief than vacatur. Not only would it prohibit the agency from relying on that interpretation in any future rulemakings, it would also require the agency to subject extant billboards to either removal or an order requiring those billboards to operate in a manner that does not violate the FSAs, for instance by keeping the image displayed by the billboard constant and unchanging. Scenic’s injury, clearly caused by the Guidance, is therefore redressable. *See Renal Physicians*, 489 F.3d at 1278 (holding that “the only way to prevent” a finding that redressability is lacking in the third-party context is “for a court not only to invalidate [the contested agency action] but also to repudiate” it).

**III.**

FHWA argues that the Guidance is not a final agency action and is therefore not reviewable under the APA. We disagree.

An agency action will be deemed final if it "mark[s] the consummation of the agency's decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks omitted). "The most important factor" in determining whether an agency action is one "from which legal consequences will flow" "concerns the actual legal effect (or lack thereof) of the agency action in question on regulated entities." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014).

The Guidance marks the consummation of FHWA's decision-making process. It comes to a definitive conclusion: the FSA's prohibition on "flashing, intermittent or moving" lights does not prevent states from permitting digital billboards, so long as they meet certain prescribed requirements. Although the Guidance does state that the FHWA "may provide further guidance in the future as a result of additional information" FHWA might receive, J.A. 535, such a statement is fairly read as a "boilerplate" indication that the agency may issue further interpretations in the future. *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022-23 (D.C. Cir. 2000). The fact that a regulation might be interpreted again at some point in the indeterminate future cannot, by itself, prevent the initial interpretation from being final.

The Guidance is also an action "from which legal consequences will flow." It creates a safe harbor such that Division Offices and states may not deny a digital billboard

permit for violating the FSA lighting standards where that billboard meets the timing and other requirements set forth in the Guidance. In this way, the Guidance withdraws some of the discretion concerning billboard permitting the Division Offices and states previously held. *See NRDC v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011) (concluding that where agency action withdraws an entity's previously-held discretion, that action "alter[s] the legal regime," "binds" the entity, "and thus qualifies as final agency action"). That safe harbor has a clear legal effect on the regulated entities here – the Division Offices and the states – and the Guidance is therefore a final agency action.

## IV.

Having concluded that Scenic has standing to bring its § 706 claim, and that the Guidance constitutes final agency action, we now review the merits of the claim *de novo*, *see Khan v. Parsons Glob. Servs., Ltd.*, 428 F.3d 1079, 1082 (D.C. Cir. 2005), and find them lacking.

Scenic argues that the Guidance is invalid because it fails to comport with the HBA's "customary use" provision. That provision states that "signs, displays, and devices whose size, lighting and spacing, *consistent with customary use* is to be determined by agreement between the several States and the Secretary, may be erected" within 660 feet of the Interstate. 23 U.S.C. § 131(d) (emphasis added). Scenic contends that the FHWA, in issuing the Guidance, changed the FSA lighting standards to such an extent that those standards are no longer "consistent with customary use." According to Scenic "[a]nything outside the scope of what an FSA meant at the time it was created cannot be 'customary use.'" Opening Br. for Appellant 36.

In *Cajun Electric Power Cooperative, Inc. v. FERC*, we clarified that

> [a]ny agreement that must be filed and approved by an agency loses its status as a strictly private contract and takes on a public interest gloss. That means that when the agency reconciles ambiguity in such a contract it is expected to do so by drawing upon its view of the public interest. And, therefore, the agency to which Congress entrusted the protection and discharge of the public interest is entitled to just as much benefit of the doubt in interpreting such an agreement as it would in interpreting its own orders, its regulations, or its authorizing statute.

924 F.2d 1132, 1135 (D.C. Cir. 1991) (internal citations omitted); *see also Nat'l Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563, 1569-71 (D.C. Cir. 1987) (treating an agency interpretation of a settlement agreement as entitled to deference similar to that owed under *Chevron* where the settlement agreement had to be approved by the agency). The FSAs, as agreements between the FHWA and individual states, *see* 23 U.S.C. § 131(d), were thus approved by the FHWA as described in *Cajun Electric*.

Further, as the District Court explained, "[b]oth Defendants and Scenic America recognize . . . that all FSA lighting provisions were established consistent with customary use." *Scenic II*, 49 F. Supp. 3d at 71 (quoting or citing both parties' briefing) (internal quotation marks omitted); *see also* Opening Br. for Appellant 36; FHWA Br. 51-52. Thus, so long as the FHWA has merely interpreted in a reasonable fashion, rather than amended, those lighting standards, that interpretation must itself be "consistent with customary use," whether or not it is precisely the interpretation that would have

been given to the standards at the time the FHWA and states first agreed upon them. *Cf. Ass'n of Am. R.Rs. v. Surface Transp. Bd.*, 162 F.3d 101, 107 (D.C. Cir. 1998) ("Our deference to an agency's reasonable interpretation of its governing statute 'is a product both of an awareness of the practical expertise which an agency normally develops, and of a willingness to accord some measure of flexibility to such an agency as it encounters new and unforeseen problems over time.'" (quoting *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 566 n.20 (1979))).

We agree with the District Court's conclusion that the FHWA's interpretation of the FSA lighting standards is not one that "'runs 180 degrees counter to the plain meaning of the' FSAs," and that it therefore "construes, rather than contradicts" the FSAs. *Scenic II*, 49 F. Supp. 3d at 62-63, 70 (quoting *Nat'l Family Planning & Reprod. Health Ass'n v. Sullivan*, 979 F.2d 227, 235 (D.C. Cir. 1992)). Although it might be possible to read the FSA lighting standards to prohibit digital billboards, those standards do not foreclose other interpretations, including the FHWA's here. Because the FHWA's interpretation of the FSA lighting provision was reasonable, the interpretation cannot be "contrary to customary use." Accordingly, Scenic's claim that the Guidance violates § 706 must fail.

\*\*\*

For the foregoing reasons, we affirm the District Court's grant of summary judgment as to Scenic's § 706 claim, vacate its judgment as to Scenic's notice-and-comment claim, and remand with instructions to dismiss Scenic's notice-and-comment claim.

*So ordered.*